# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 29 2015, 9:19 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT S.R.

Shawna D. Webster
Webster & Webster, LLC
Vincennes, Indiana

ATTORNEY FOR APPELLANT D.R.

Andrew K. Porter
Feavel & Porter
Vincennes, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Deputy Attorneys General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of S.R., Mother, and D.R., Father, and H.A.R., H.G.R., H.O.R., and N.R., Children: | September 29, 2015 |
| S.R. and D.R., | Court of Appeals Case No. 42A01-1501-JT-34 |
| *Appellants-Respondents,* | Appeal from the Knox Superior Court |
| v. | The Honorable W. Timothy Crowley, Judge |
| Indiana Department of Child Services, | Trial Court Cause Nos. 42D01-1403-JT-6 42D01-1403-JT-7 42D01-1403-JT-8 42D01-1403-JT-9 |
| *Appellee-Petitioner.* | |

**Kirsch, Judge.**

[1] S.R. ("Mother") and D.R. ("Father") (together, "Parents") appeal the juvenile court's order terminating their parental rights to their children, H.A.R., H.G.R., H.O.R. and N.R. (collectively, "the Children"). Parents each raise several issues in their respective briefs, which we consolidate and restate as two issues:

> I. Whether the Indiana Department of Child Services ("DCS") was required to make reasonable efforts with Father toward reunification with the Children while Father was incarcerated; and

> II. Whether sufficient evidence was presented to support the termination of Parents' parental rights.

[2] We affirm.

## Facts and Procedural History

[3] H.A.R. was born on November 23, 2006, H.G.R. was born on October 2, 2007, H.O.R. was born on September 9, 2009, and N.R. was born on August 20, 2012. Both Mother[1] and Father are the biological parents of the Children and were married, but separated, at the inception of this case. However, at the time of the final termination hearing, Parents' marriage had been dissolved.

---

[1] Mother is also the biological mother of H.H., who was fifteen years old at the time of the termination proceedings. Father is not the biological father of H.H. The status of Mother's parental rights to H.H. is unclear from the record.

[4] On February 27, 2013, DCS received a report that Father was neglecting H.A.R. by not providing the proper nutrition and care she required as a child with special needs and various medical conditions. After an investigation by DCS, the Children were allowed to remain in the care of Mother, who was told to seek assistance from DCS if needed. On April 1, H.G.R. was bitten on the cheek by a dog. Mother did not initially take her to the doctor, but did take her at some point to the emergency room where she was treated for an infection. A report was made to DCS regarding this dog bite incident.

[5] On April 3, 2013, the Children were removed from Mother's care and placed with Father. The next day, DCS filed a Child in Need of Services ("CHINS") petition, alleging that Mother neglected the Children as they had poor hygiene and dirty clothing, that Mother and the Children were living with Mother's brother who had molested H.H., Mother's fifteen-year-old daughter, that Mother was "drug-affected," and that Mother often was absent from the home, leaving H.H. to care for the Children. *DCS Ex*. 5. At a detention hearing held on April 4, 2013, the juvenile court removed the Children from Father's care due to his failure to attend the hearing and to make sure the Children attended school. On May 15, 2013, Parents entered into a written stipulation admitting the CHINS allegations, and the Children were adjudicated as CHINS.

[6] On June 12, 2013, a dispositional hearing was held, and the juvenile court ordered Parents, in pertinent part, to: (1) secure and maintain stable housing and a legal course of income; (2) complete a substance abuse evaluation and follow all recommendations; (3) not consume, manufacture, trade, distribute, or

sell any illegal controlled substances; (4) submit to random drug and alcohol screens; (5) complete a psychological evaluation and follow all recommendations; (6) attend all scheduled visitations with the Children; (7) ensure the Children's medical and mental health needs are met; and (8) complete any program recommended by the DCS Family Case Manager ("FCM") or other service provider. On March 11, 2014, DCS filed its petition to terminate the parental rights of Parents. Termination hearings were held on July 23, October 7, December 3, and December 5, 2014.

[7] During the hearings, the following testimony and evidence was presented. DCS referred Mother for a mental health evaluation, home-based case management services, a substance abuse evaluation, random drug screens, and visitations with the Children. Mother failed to comply with the mental health evaluation. Beginning in April 2013, Heather Ray ("Ray") provided Mother with parent aide services to address employment, transportation, sobriety, community resources, coping skills, and discipline techniques. In 2013, Mother was compliant 98% of the time in meeting with Ray, but in 2014, Mother was only compliant 51% of the time. Mother made progress toward her goals, but could not maintain that progress. She was assigned a new parent aide in March 2014 because she was not happy with Ray. In August 2014, the new parent aide tried to get Mother into a halfway house that would help her get into substance abuse programs, but Mother never followed through. Because Mother did not attend her meetings consistently, her case with parent aide services was closed in October 2014.

[8] Mother completed an initial substance abuse evaluation on April 30, 2013 and was diagnosed with Methamphetamine Dependency and Adjustment Disorder. Mother was recommended to complete an intensive outpatient program ("IOP"), which she began on May 13, 2013. However, she left because she felt uncomfortable due to a family member being part of the group. Instead, Mother was to attend individual meetings with a counselor, but she missed four appointments and was discharged for noncompliance. She began services for a second time on November 6, 2013, but was again discharged for noncompliance on November 20. Mother attempted services for a third time in March 2014 after a second evaluation, but she cancelled or failed to attend several appointments and had not attended since July 2014.

[9] Mother also received treatment at another facility, and eventually completed the treatment program and was recommended to attend ninety AA/NA meetings in ninety days, but her attendance was sporadic. Mother relapsed on April 30, and May 20, 2014 by taking methamphetamine. Between June 15, 2013 and September 14, 2014, Mother had thirteen positive drug screens, which were all positive for methamphetamine and some were also positive for amphetamine, ephedrine, or alcohol. Ten of these positive drug screens occurred after she had completed treatment. Mother also failed to show for eight drug screens and failed on eighteen occasions to contact her service provider to inquire as to whether she needed to take a drug screen.

[10] From December 4, 2013 until September 17, 2014, Mother's visitation with the Children was supervised by parent aide Ray. Mother was 90% compliant with

attendance at the visitations in 2013 and 84% compliant in 2014. However, her visitations with the Children never moved past being supervised due to Ray's concerns. These included that Mother had to be reminded how and when to feed H.A.R. through her feeding tube and when to change N.R.'s diapers. Mother also did not properly administer medication into H.A.R.'s port and did not communicate well with H.A.R., who was not able to communicate in the same way as the other Children. Mother also failed to bring extra clothing for the Children, and the visitations had to end early when H.O.R. had an accident. Additionally, Mother admitted that she was sometimes high on drugs during the visitations.

[11] On September 17, 2014, Mother was arrested for a probation violation and was released on November 30, 2014. At the time of the termination hearing, Mother was living with her boyfriend and his sixteen-year-old son in a two-bedroom mobile home, which the FCM thought was inappropriate and too small for two adults and six children. Prior to living with her boyfriend, Mother was living with her brother and then her father, sleeping on either the couch or the floor. Mother was not employed at the time of the termination hearing, and during the underlying case, she was only employed for two to three months. Further, DCS had concerns about Mother's boyfriend because he tested positive for methamphetamine, made service providers feel threatened, and argued with Ray during visitations.

[12] Turning to Father's situation, DCS referred Father for a mental health evaluation, home-based case management services, a substance abuse

evaluation, random drug screens, and visitations with the Children. Father completed a mental health evaluation, but failed to follow through with any of the recommendations. From April 3, 2013 until July 24, 2014, Father worked with parent aide Ray whose goals were to assist Father with employment, vocational rehabilitation, parenting skills, budgeting, discipline, and domestic violence education based on issues between him and his girlfriend. He was only 55% compliant in 2013 with these services and only 40% compliant in 2014 and made no progress toward his goals.

[13] Father did not attend an initial substance abuse evaluation and several subsequent appointments, but eventually had an initial assessment in April 2014, which resulted in diagnoses of alcohol dependency, adjustment disorder with anxiety, and depression. Father was recommended to participate in IOP, but failed to follow through, and his case was eventually closed. Between September 2013 and July 2014, Father had six positive drug screens, which were positive for various substances including hydrocodone, THC, amphetamine, and methamphetamine. He also failed to report or was unable to be located for twenty-six drug screens.

[14] Ray also supervised Father's visitations with the Children from November 2013 until July 2014. He was only 64% compliant in attendance for the visitations in 2013 and 50% compliant in 2014. When he attended visitations, Ray had concerns, which included that it took Father longer than it should have for him to feed H.A.R., and he did not come prepared with things needed to feed the Children. Father did not progress past supervised visitation with the Children.

[15] Father had several criminal convictions, which included operating while intoxicated, public intoxication, and resisting law enforcement. He was incarcerated in July 2014 for a probation violation and had an expected release date of January 2015. While incarcerated, Father did not receive any services from DCS and did not voluntarily participate in any other programs. DCS did not offer Father any services during his incarceration due to his previous non-compliance with drug screens, visitation, and parent aide services.

[16] Before his incarceration, Father had been living with his girlfriend on an intermittent basis. He received approximately $710 per month in Social Security benefits. Father previously worked between eight to fourteen hours a day for a man doing construction, concrete work, and working on cars. However, Father had a falling out with the man and was no longer employed by him at the time of the hearing.

[17] H.A.R. was born with severe cognitive disability, had a feeding tube through which she received her food, and was not able to communicate verbally. When the Children were still in Parents' care, H.A.R.'s teacher had serious concerns regarding her care due to H.A.R. coming to school very dirty with soiled clothing that the teacher would change and wash for her. H.A.R.'s feeding tube was sometimes bloody and always dirty. She was also underweight, and the school nurse would have to weigh her weekly. The teacher stated that Parents did not always send in the liquid formula H.A.R. required, and the school nurse would have to buy some because H.A.R. was hungry and would cry and reach

for her feeding tube. H.A.R. also required glasses and braces for her legs that Parents did not provide for her.

[18] When DCS received the report in February 2013 concerning H.A.R. being taken to the hospital, she was diagnosed with failure to thrive. Father had been feeding her tomato juice through her feeding tube instead of the Boost formula she needed. H.A.R.'s teacher noticed a huge change in the child within two weeks of being removed from Parents' home. H.A.R. was able to communicate her needs and had been given leg braces and glasses.

[19] At the time of removal from Parents' care, the Children all had poor hygiene, dirty clothes, and an odor. The Children's heads had been shaved due to issues with lice. Since removal, H.A.R. has been placed with foster mother, K.S. Children H.G.R., H.O.R., and N.R. were originally placed with foster mother, M.W., and were removed due to M.W.'s health, but were eventually placed back in M.W's care. At the time of the termination hearing, H.G.R. was placed with H.A.R. in K.S.'s home. All of the Children were bonded to their foster mothers, and since being removed from Parents' care, the Children are clean and have improved drastically overall.

[20] DCS was never able to recommend that Children be returned to the care of Parents due to Parents' failure to maintain sobriety, noncompliance with services offered, and inability to maintain stable housing and employment. Ray testified that she did not believe it was safe to return the Children to Parents' care based on Parents' inability to properly and adequately care for the

Children. *Tr*. at 207, 220. The FCM testified that termination was in the Children's best interests because the Parents had failed to reunify with the Children during the twenty months the case was pending, and the Children needed permanency. *Id*. at 324. The guardian ad litem ("GAL") also agreed that termination was in the best interest of the Children based on the Children's need for permanency and Parents' lack of adequate housing, unemployment, and continued positive drug screens. *GAL Ex*. A at 16. The GAL was further concerned with Parents' ability to manage the Children's medical and therapeutic needs. *Id*. At the time of the termination hearing, DCS's plan for the Children was adoption, and their current foster mothers were willing to adopt.

[21] On December 29, 2014, the juvenile court issued its findings of fact, conclusions, and order terminating Parents' parental rights to the Children. Parents now appeal.

## Discussion and Decision

## I. Reasonable Efforts

[22] Father argues that DCS failed to provide him reasonable efforts toward reunification when it did not offer him services once he became incarcerated. He asserts that DCS had an obligation under Indiana Code section 31-34-21-5.5(b) to provide reasonable efforts towards reunification and that ceasing to provide any services to him while he was incarcerated was "an absolute failure on . . . DCS's part to make all reasonable efforts towards reunification."

*Appellant's Br.* at 20. Father contends that, although he was never fully compliant with services prior to incarceration, he did comply at some level, and DCS should have provided him an opportunity toward reunification even though he was incarcerated. He further claims that DCS's failure to provide services infringed on his constitutionally protected right to raise his own children.

[23] Indiana Code section 31-34-21-5.5(b) states that DCS "shall make reasonable efforts to preserve and reunify families." However, the law concerning termination of parental rights does not require DCS to offer services to the parent to correct the deficiencies in childcare. *In re B.D.J.*, 728 N.E.2d 195, 201 (Ind. Ct. App. 2000); s*ee In re H.L.*, 915 N.E.2d 145, 148 (Ind. Ct. App. 2009) (concluding that although "the record supports Father's assertions that the DCS did not actively promote the development of his relationship with H.L. . . . the absence of services was due to Father's incarceration and he does not point to any evidence that he specifically requested . . . services"); *Rowlett v. Vanderburgh Cnty. Office of Family & Children*, 841 N.E.2d 615, 622 (Ind. Ct. App. 2006) (stating that DCS was not required to provide Father with services directed at reuniting him with his children), *trans. denied*.

[24] Here, prior to his incarceration in July 2014, Father had over a year to participate in services and work toward reunification with the Children. However, Father was not compliant with the services offered to him by DCS in that time period. During that time, he failed to submit to twenty-six drug screens, failed to complete substance abuse treatment, failed to complete a

mental health evaluation, only attended 65% of the visitations in 2013 and only 50% in 2014, and only attended 58% of the parent aide sessions in 2013 and only 40% in 2014. Father also admitted at the hearing that he did not request services from DCS while incarcerated and failed to participate in any programs offered in jail. *Tr.* at 474-75. "[A] parent may not sit idly by without asserting a need or desire for services and then successfully argue that he was denied services to assist him with his parenting. *In re B.D.J.*, 728 N.E.2d at 201.

[25] Father also contends that his parental rights were violated because mere incarceration is insufficient to warrant termination of his parental rights. However, his argument is incorrect because his parental rights were not terminated based on his mere incarceration. Father became incarcerated in July 2014, over a year after the underlying CHINS case began. The evidence showed that he was not compliant with the services offered to him prior to his incarceration, including continuing to use controlled substances, failing to consistently attend visitations and other services, failing to maintain stable housing and employment, and not complying with recommendations of his substance abuse evaluation. We, therefore, conclude that Father's parental rights were not terminated based on his mere incarceration, and DCS did not violate his rights by not offering him services during his incarceration.

## II. Sufficient Evidence

[26] We begin our review by acknowledging that this court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied*. When

reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re B.J.*, 879 N.E.2d at 14.

[27] Here, in terminating Parents' parental rights to the Children, the juvenile court entered specific findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.*

[28] The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution. *In re C.G.*, 954 N.E.2d 910, 923 (Ind. 2011). These parental interests, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *In re J.C.*, 994

N.E.2d 278, 283 (Ind. Ct. App. 2013). In addition, although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.*

[29] Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2). Moreover, if the court finds that the allegations in a petition described in section

4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a) (emphasis added).

[30] Initially, Father contends that the evidence presented did not support the juvenile court's finding that he was not "willing, or able, to do the things necessary to bring about reunification" with the Children. *Appellant's App.* at 19. He contends that he, at some level, complied with the dispositional decree and participated in many of the requirements, and therefore, the evidence did not support this finding. We disagree. The evidence showed that Father failed to submit to twenty-six drug screens, did not attend meetings, failed to complete a mental health evaluation, only contacted the FCM minimally, was never more than 64% compliant in visitations with the Children, and was never more than 58% compliant in parent aide services. We conclude that the evidence supported this finding by the juvenile court.

[31] Both Parents argue that DCS failed to prove the required elements for termination by sufficient evidence. Specifically, they contend that DCS failed to present sufficient evidence that the conditions that resulted in the Children being removed would not be remedied. They further allege that DCS failed to present sufficient evidence that termination of their parental rights was in the best interests of the Children.

[32] In determining whether there is a reasonable probability that the conditions that led to a child's removal and continued placement outside the home would be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*,

989 N.E.2d 1225, 1231 (Ind. 2013).  First, "we must ascertain what conditions led to their placement and retention in foster care."  *Id*.  Second, "we 'determine whether there is a reasonable probability that those conditions will not be remedied.'"  *Id*. (citing *In re I.A.,* 934 N.E.2d 1132, 1134 (Ind. 2010) (citing *In re A.A.C.,* 682 N.E.2d 542, 544 (Ind. Ct. App. 1997))).  In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against " 'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'"  *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (quoting *K.T.K.,* 989 N.E.2d at 1231).  "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination."  *Id*.  Although trial courts are required to give due regard to changed conditions, this does not preclude them from finding that a parent's past behavior is the best predictor of their future behavior.  *Id*.

[33]  In the present case, the evidence showed that, on February 27, 2013, DCS received a report that H.A.R. had been admitted to the hospital and diagnosed with failure to thrive due to the fact that Father had been feeding her tomato juice through her feeding tube instead of nutritional formula she needed.  At that time, there were also concerns about Mother's drug use, housing situation, and leaving H.H., her fifteen-year-old daughter, to care for the Children.  On April 1, 2013, DCS received a report that H.G.R. had been bitten by a dog and that Mother had failed to seek immediate medical attention and the bite had

become infected. The Children were removed from Mother's care and placed with Father, but were taken out of his care just a few days later due to Father's failure to attend the detention hearing and to ensure the Children's attendance at school. The CHINS petition alleged that Mother neglected the Children as they had poor hygiene and dirty clothing, Mother and the Children were living with Mother's brother who had molested H.H., Mother's fifteen-year-old daughter, Mother was "drug-affected," and Mother often was absent from the home, leaving H.H. to care for the Children. In its detention report, the reasons for removal by DCS were Mother's refusal to cooperate and comply with DCS, the Children's poor hygiene, Mother's failure to submit to any drug screens, Mother's living situation, and H.H. was often left to care for the other Children.

[34] As to Mother, the evidence at the termination hearing showed that, although she complied somewhat with the services offered to her by DCS, she was only 51% compliant with the parent aide services in 2014 and these services were closed due to noncompliance in October 2014. Mother failed to complete substance abuse treatment three separate times, and although she eventually completed treatment on her fourth attempt, she continued to test positive for methamphetamine ten times after completing treatment. She also did not follow through with attending ninety AA/NA meetings in ninety days as she was recommended to do after treatment. She further failed to attend at least eight drug screens and failed, on eighteen separate occasions, to contact service providers about whether she needed to take a drug screen.

[35]     Mother also failed to maintain stable employment and adequate housing. She was not employed at the time of the termination hearing and had only been employed for approximately three months during the pendency of the case. Additionally, at the time of the hearing, Mother was living in a two-bedroom mobile home with her boyfriend and his sixteen-year-old son, which was not adequate housing for two adults and six children. DCS also had concerns regarding Mother's boyfriend due to his arguing with service providers and testing positive for drugs. Mother's failure to engage in services, continued drug use, and inability to maintain stable housing and employment reflect an unwillingness to modify her behavior to provide a safe and secure home for the Children. Based on the evidence presented, we conclude that the juvenile court did not err in finding that there was a reasonable probability that the conditions that resulted in the removal and the reasons for continued placement of the Children outside the home would not be remedied.

[36]     As to Father, the evidence at the termination hearing showed that Father failed to complete a mental health evaluation and failed to complete substance abuse treatment. In not completing substance abuse treatment, Father failed to address his issues with both drugs and alcohol and, therefore, continued to test positive for controlled substances. Father also failed to maintain stable housing and employment. At the time of the termination hearing, Father was unemployed, and his housing was not stable as he was only living "off and on" with his girlfriend. *Tr.* at 266. Additionally, Father did not consistently attend visitation with the Children, and when he did, the service providers had

concerns about his ability to care for the Children, particularly in feeding H.A.R. Father was also only minimally compliant with attending parent aide services and made no progress toward his goals. Further, at the time of the termination hearing, Father had violated his probation and was incarcerated with an expected release date of January 2015. Based on the evidence presented, we conclude that the juvenile court did not err in finding that there was a reasonable probability that the conditions that resulted in the removal and the reasons for continued placement of the Children outside the home would not be remedied.

[37] Parents next argue that insufficient evidence was presented to prove that termination is in the best interest of the Children. In determining what is in the best interests of the child, the trial court is required to look at the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010) (citing *In re D.D.,* 804 N.E.2d at 267), *trans. dismissed.* In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *Id*. (citing *In re R.S.,* 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*). The trial court need not wait until the child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.* Additionally, a child's need for permanency is an important consideration in determining the best interests of a child, and the testimony of the service providers may support a finding that termination is in the child's

best interests. *Id.* (citing *McBride v. Monroe Cnty. Office of Family & Children,* 798 N.E.2d 185, 203 (Ind. Ct. App. 2003)).

[38] Here, the evidence presented showed that Parents were not able to provide for the Children's needs and to provide them with the necessary stability and permanency. At the time of the termination hearing, both Parents were unemployed and neither of them had adequate and appropriate housing for the Children. Additionally, Father was incarcerated at the time of the hearing and was not due to be released until January 2015. Further, both Parents continued to test positive for controlled substances. A parent's historical inability to provide a suitable environment along with the parent's current inability to do the same supports a finding that termination of parental rights is in the best interests of the children. *In re A.P.*, 981 N.E.2d 75, 82 (Ind. Ct. App. 2012).

[39] There was also evidence that Parents were unable to comprehend and provide for the Children's medical and therapeutic needs. H.A.R has special needs and is fed through a feeding tube. There was concern regarding whether Parents were able to take care of these needs. During visitations, Mother had to be reminded to feed H.A.R. and was not able to properly administer medication through H.A.R.'s port. Father had issues in feeding H.A.R. in that it took him much longer to feed her than it should have, and it was due to him feeding her tomato juice instead of her formula that she was admitted to the hospital and diagnosed with failure to thrive in February 2013. Additionally, the Children had been attending mental health appointments, and there was concern that

Parents would not be able to get the Children to their necessary mental health and medical appointments.

[40] Both the FCM and the GAL recommended termination as being in the Children's best interests due to the Children's need for permanency and Parents' failure to do what was necessary for reunification, such as maintaining stable housing and employment and remaining drug free. DCS, likewise, was never able to recommend that the Children be returned to Parents' care due to Parents' failure to maintain sobriety, noncompliance with services offered, and inability to maintain stable housing and employment. Ray testified that she did not believe it was safe to return the Children to Parents care because of Parents' inability to properly and adequately care for the Children. *Tr.* at 207, 220. Based on the above, we conclude that sufficient evidence was presented to prove that termination was in the best interest of the Children. In arguing that termination was not in the best interests of the Children, both Mother and Father assert that they had a strong bond with the Children and severing that bond would be harmful to the Children. However, this is just a request for us to reweigh the evidence, which we cannot do. *In re D.D.*, 804 N.E.2d at 265.

[41] We will reverse a termination of parental rights "only upon a showing of 'clear error'-- that which leaves us with a definite and firm conviction that a mistake has been made." *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *In re Egly*, 592 N.E.2d 1232, 1235 (Ind. 1992)). Based on the record before us, we cannot say that the juvenile court's termination of Parents'

parental rights to the Children was clearly erroneous. We therefore affirm the juvenile court's judgment.

[42] Affirmed.

Najam, J., and Barnes, J., concur.